Alexander Del Giorno, J.
The claimant owns and operates a public water supply system throughout the City of Glen Cove, Nassau County. The subject property, known as the Carney Street Station, was the largest of four well sites it owned.
The subject property consisted of 5.625 acres, or 245,024 square feet, before the appropriation. The State appropriated 2.561 acres. To the claimant there remained 2.889 acres in the westerly remainder, or 125,856 square feet, and 0.175 acres or 7,623 square feet in the easterly remainder, or a total of 3.064 acres. The differences disclosed by the testimony of the appraisers concern mainly the westerly remainder, and most references herein are to that remainder only, for the reason that the easterly remainder was vacant land with no improvements.
There were 19 wells on the land, known as shallow wells, which the claimant stated could be replaced fully by four deep wells. The State appropriated four of the existing wells, reducing the average yield by some 300,000 gallons daily out of a normal average of 2,500,000.
Of the proposed four deep wells, two were within the appropriated area. However, claimant conceded that a realignment of the plans would permit three deep wells to be installed in the remainder land, thus resulting in the loss of only one probable deep well.
Prior to the appropriation, the claimant’s land was at grade with and had direct access to Carney Street, as well as to Stanco Street. The easterly remainder retains access to Stanco Street. It descends rather sharply from Stanco Street, the same as before the appropriation. The westerly remainder was landlocked by the first appropriation map filed.
The State revised its map so as to permit the building of a ramp from the westerly remainder to the raised new highway, *582 which at that location is 10 feet higher than the remainder. The 'State built the ramp which extends in an arc some 180 feet into claimant’s land and occupies 6,000 square feet thereof.
Furthermore, the State left an opening 24 feet wide in the divider mall of the highway to permit left turns to and from the remainder. This cut is in front of the ramp.
A view of the area indicates that the new highway is raised from 8 feet to 10 feet on the north of and 15 feet on the south of the ramp; that on the extreme westerly boundary of the land runs Glen Brook, which courses south to north and carries industrial waste from the nearby industrial plants located to the south of claimant. Along the easterly boundary of the westerly remainder and close to the right-of-way fence erected by the State, there runs another, nameless creek which passes through a pipe under the ramp and which runs into and merges with Glen Brook at or close to the northern line of the property. This creek also carries industrial waste.
The remainder land north of the ramp is wet and a portion even swampy.
It appears that industrial acreage in the area is very scarce and, therefore, the court is of the opinion that neighboring industry would, in all probability, be happy to purchase this remainder at a fair price even though it be landlocked, as an expansion of their plant or as an addition thereto, because it is zoned industrial, is advantageously located and its two creeks are essential to carry industrial waste to the sea.
The fact of its desirability at a fair price, in spite of the disadvantages created for the land by the State, however, only operates to reduce damages but not to eliminate responsibility therefor.
The State’s appraiser, a fine gentleman, well known to the court, who never before appraised a public well site, contented himself with the statement that he did not assign any consequential damages to the westerly remainder because he was instructed to disregard consequential damages. He satisfied himself with evaluating the land and buildings and adding thereto the value of the improvements as found by the claimant’s expert, Mr. Stone, a professional engineer and appraiser of this type of enterprise.
All the appraisers agreed that the highest and best value of the property, both before and after the appropriation, was as it was then used, and also for other industrial uses requiring substantial quantities of water in their operation; but they differed greatly with regard to the value they would assign for these uses.
*583 The State’s appraiser was instructed by the Attorney-G-eneral to disregard any consequential damages he might find because of the language and express purpose of permanent easement taken, which instructions are based on the doctrine of Jafco Realty Corp. v. State of New York (18 A D 2d 74, affd. 13 N Y 2d 556) and Clark v. State of New York (20 A D 2d 182, affd. 15 NY 2d 990).
The claimant claimed that it is landlocked, except for the ramp which is available only while claimant remains as a public water supply company. The claimant also contends that the cut in the mall divider is inadequate, while the State says it is adequate. The court, using a private passenger vehicle, crossed and recrossed four times from the roadway to the ramp and vice versa. It found said opening in the mall too small, providing no area of safety before making the turn. Vehicles travel at 50 to 65 miles per hour. The sight distance is not too long. In the dark, a turn here may be the source of a fatal collision.
The court finds that there was substantial consequential damage which is not affected by the doctrine of the above cases, for the court finds them inapplicable here.
In the Jafco case, the original easement of access granted by the municipality to the claimant was left intact by an overpass built by the State but subject to the nebulous meaning of the easement taken by the State.
In the Clark case, the Court of Claims determined that the broad language of the power line easement taken amounted to a complete taking. After the trial, the Power Authority wished to submit a declaration limiting its easement rights. This offer was refused. The Appellate Division stated that the declaration should have been accepted by the trial court, accepted it itself on appeal, and reduced the awards sharply.
Both of these cases limit the language of the permanent easement to the actual physical results achieved by the appropriation and instruct the lower court to further provide in its decision that in the event of any future disturbance of the physical relationship created by the permanent easement between the remainder and the State’s right of way, the claimant may consider the State’s act a de facto appropriation and sue therefor.
In the present ease, we have no existing easement at the time of the appropriation which we might consider either disturbed, undisturbed, limited or eliminated by the appropriation. Here, the State created a new road, landlocked the remainder, and later amended its maps to create a permanent easement of egress and ingress. Its language may not be interpreted or construed, *584 its intent may not be opined, its future may not be guessed at, the probability of what the State may do, in the event of the cessation of the public well site, may not be certified in the manner hopefully described by the State’s appraiser: “ I can’t believe that the State would not permit access.”
Nor can we demand of the claimant as would the State, that it can make its own arrangements with the neighbors to the south for an easement of ingress and egress through their lands to a public road on the south.
A reading of the language describing the fee taking known as 1 ‘ Parcel 14-Fee Without Access, But With Special Reservations ’ ’ discloses a clear and unambiguous intent on the part of the State to be done with and hear no more of such right of access once the claimant ceases to function as a public water supply company:
“ reserving, however, to the owner of the property described above, and such owner’s successors and assigns, only so long as they shall use the adjoining property for public water supply purposes, but only to an extent which will not interfere with the use of said property for highway purposes, the right of access to and from abutting property at the place of entry and exit having a width of 16 feet along the new westerly highway boundary opposite center line Station 111+50 together with a right of access 24 feet wide for crossing the highway mall at said Station, both as shown and designated on the above map. Such rights of access shall terminate and be permanently extinguished providing said rights are subjected to any other uses than access for public water supply purposes on remaining property of the owner located on the west of said Parcel No. 14.
“also, reserving, however, to the owner of the property described above and such owner’s successors and assigns, only so long as they shall use the adjoining property for public water supply purposes, but only to an extent which will not interfere with the use of said property for highway purposes, the right, privilege and easement to transmit water, electricity, messages by means of electricity and gas, under and across the above described Parcel No. 14 within an area 20 feet wide shown on the above map at .Station 109+63± as ‘ Water and Utility lines right-of-way ’; and for such purposes, construct, reconstruct, maintain and operate such pipe lines, consisting of such sleeves, encasements, pipes, valves, wires, cables, conduits and appurtenances as may be deemed necessary for the proper maintenance and operation thereof, providing that valves shall be placed in such water and gas lines at or near each highway property line for the purpose of shutting off the flow of water *585 and gas across said highway and no valve, manhole or other structure shall be placed on or above the surface of the highway property, also, providing that the right of ingress, egress, and regress for the purposes of construction, reconstruction, maintenance, operation and inspection shall be limited to the areas lying between the outside edges of the highway shoulders and the highway property line with no right of access for crossing, parking or working on the highway pavement or shoulders for any or all of these purposes; however, when it is necessary that the construction, reconstruction, maintenance and operation of such facilities requires crossing, blocking or barricading the highway pavement or shoulders, it shall be done only upon a written permit from and upon conditions specified by the Superintendent of Public Works or other authorized representatives acting for the People of the State of New York, except at times of extreme emergencies.”
Had the State actually intended to apply the doctrine of Clark v. State of New York (20 A D 2d 182, supra) it, too, like the Power Authority, could have brought into the court a document granting that right of access to any adjacent owner for all time.
The State, also, admittedly entered claimant’s land on March 4,1959. The original map was filed in the office of the Secretary of State on July 18,1958, the revised map was filed October 11, 1960, and in the County Clerk’s office November 4,1960.
The court considers that the liability of the State was established on the date of entry, March 4,1959, and that interest shall be allowed upon the damages found from March 4, 1959 to the date of entry of judgment herein.
The court finds that the claimant’s property before the appropriation was of the fair and reasonable market value of $231,500, allocating $72,000 to the improvements and $159,500 (rounded) to the land at 65 cents a square foot.
The court finds that the remainder was of the reasonable market value of $109,560, allocating $50,360 to the westerly remainder at 40 cents a square foot, plus $55,000 for the improvements, and $4,200 (rounded) to the easterly remainder of 7,623 square feet at 55 cents a square foot.
The court finds the claimant was damaged in the sum of $121,940 for which it is entitled to judgment against the State with interest as herein provided.